IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    Plaintiff,

vs.                                                  No. 22-CR-365-DHU

JOEL RUIZ,

    Defendant.

### MR. RUIZ'S REPLY TO THE GOVERNMENT'S RESPONSE TO HIS MOTION TO SUPPRESS EVIDENCE AND STATEMENTS

Joel Ruiz, through his undersigned counsel, Assistant Federal Public Defenders, Amanda Lavin and Emily Carey, submits this reply to the government's response to his motion to suppress.

**1. This Court should hold an evidentiary hearing because the parties fundamentally disagree on the facts and the law.**

The parties fundamentally disagree on the facts and the law that applies to the improper seizure of statements from Mr. Ruiz by law enforcement. Mr. Ruiz asks that the Court hold an evidentiary hearing to resolve the factual and legal disputes. He also requests that the Court allow the parties to brief the issues raised in the motion to suppress, as well as any other issues that may become relevant after the evidentiary hearing is over.[1]

---

[1] Mr. Ruiz does not concede that statements purportedly attributable to him were made voluntarily. Given the government's response and its transcript, it is possible that the evidence at the hearing will support an argument the statements were involuntary as well. If so, that would be a reason for the Court to allow post-hearing briefing.

## 2. Mr. Ruiz was in the custody of law enforcement officers when they seized statements from him in violation of *Miranda.*

The government contends Mr. Ruiz was not in custody because he was not "restrained" and "there was no threatening presence of display of force." Doc. 59 at 7. Additionally, says the government, the FBI agent asked him "open ended questions . . . allowed [him] to answer the questions without interruption" and was told he was not being arrested at that moment. *Id.* at 6-7. The government's argument ignores the aggregate circumstances. The objective facts demonstrate that a person in Mr. Ruiz's position would have reasonably believed that he was not free to leave nor that he could decline to answer any questions. *See United States v. Griffin*, 7 F.3d 1512, 1518 (10th Cir. 1993) (custodial setting often defined by extent to which person told he "is free to refrain from answering questions or to end the interview at will."). Indeed, as the government tacitly admits, before the questioning began, the officers did not tell Mr. Ruiz he was free to leave whenever he wanted nor that he could refuse to answer their questions.

It is axiomatic that officers need to issue *Miranda* warnings when they interrogate an invidividual who is in custody. *United States v. Revels*, 510 F.3d 1269, 1273 (10th Cir. 2007). Though the question of whether there has been a "seizure" under the Fourth Amendment and whether a person is "in custody" under the Fifth Amendment share certain principles, the Tenth Circuit has "definitively foreclosed any attempt to equate the two analytically distinct inquiries." *Id.* at 1273. The court explained that "[a]lthough some detentions not rising to the level of a formal

arrest may be reasonable within the meaning of the Fourth Amendment, those same detentions may nonetheless create the custodial situation in which *Miranda* was designed to operate." *Id.* at 1274.  Said differently, "a suspect can be placed in police 'custody' for purposes of *Miranda* before he has been 'arrested' in the Fourth Amendment sense." *United States v. Perdue*, 8 F.3d 1455, 1463-64 (10th Cir. 1993).

Thus, even if the officers were acting lawfully when they summoned Mr. Ruiz to the police station, it was a deprivation of his right against self-incrimination to fail to issue *Miranda* warnings.  That is because the "only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984).  As Mr. Ruiz explains, the totality of the objective circumstances demonstrate that an individual in his situation would have reasonably believed that his participation and cooperation was insisted upon.

> a. **Officers were required to recite the *Miranda* warnings to Mr. Ruiz because a reasonable person would have believed that his freedom of action had been meaningfully curtailed**.

The Tenth Circuit has put forth three factors that inform the custody determination:

> (1) whether the circumstances demonstrated a police-dominated atmosphere; (2) whether the nature and length of the officers' questioning was accusatory or coercive; and (3) whether the police made [the defendant] aware that she was free to refrain from answering questions, or to otherwise end the interview.

*Revels*, 510 F.3d at 1275.  The final conclusion, however, must be based on "an examination of the totality of the circumstances." *Griffin*, 7 F.3d at 1518.

The three factors listed above weigh heavily in favor of finding a custodial setting and the government's response demonstrates it has not shown otherwise. The first factor is clearly established; the atmosphere was police dominated. The police were in full control "of the questioning environment." *Griffin*, 7 F.3d at 1518-19. Mr. Ruiz was separated from his wife, brought into a secured area, placed in a closed, nonpublic room with officers who suspected him of sexual abuse and then questioned him accordingly.[2] He sat at a table opposite the officers, both of which he would have had to walk around to get to the door. *See Griffin*, 7 F.3d at 1519 (accused in custody in part because officer placed her "in a situation where there was no exit except around the police."); *State v. Muntean*, 189 Vt. 50 (2010) (accused in custody for *Miranda* purposes in part because he was taken to "secure part of the [police] building"). This confined space in which the officers placed Mr. Ruiz was entirely within their control and he was never told he could walk out of the station whenever he wanted. *See Griffin*, 7 F.3d at 1518-19 ("Where police are in full control of the questioning environment, custody is more easily found.") & *id.* at 1519

---

[2] The government believes it matters that the officers questioned Mr. Ruiz in a "conference" room, not an "interrogation" room. Doc. 59 at 1, 6. It doesn't. First, there is no reason to believe that Mr. Ruiz knew there were two different rooms and that the officers were using the conference room, not the interrogation room. Second, nothing in the government's transcript proves Mr. Ruiz was told that the officers had opted to use that room, not the interrogation room. Similarly, they did not tell him he was in their conference room. Third, other than the government's designation, there is no evidence that the rooms are different, let alone that Mr. Ruiz would know (and appreciate) the difference. That difference may mean something to the officers interrogating Mr. Ruiz, but it is not relevant to the custody issue. "The analysis of the custodial requirement focuses on what a person in the same position as the suspect would reasonably believe, and not upon how a reasonable law enforcement officer would perceive the situation." *Griffin*, 7 F.3d at 1519.

(accused in custody because she was not told she could leave at any time).

As to the second factor, the nature and length of the questions was both accusatory and coercive. The length of the officers' questioning was significant. The encounter lasted over hour, beginning from the moment Mr. Ruiz sat down. *See* Doc. 59-1 at 1. As to the nature of the questions, they were designed to incriminate Mr. Ruiz. Even seemingly innocuous questions about where he lived, with whom and for how long were intended to corroborate the alleged victims' version of events and place Mr. Ruiz in their proximity. Each question was designed to develop proof of the exact offenses for which the government charged Mr. Ruiz. And as the officers continued, their questions became more specific and went on even when the officers believed Mr. Ruiz was incriminating himself. It is not only that the officers "*should have known*" that their questions "were reasonably likely to elicit an incriminating response," their express purpose was to elicit an incriminating response. *See Rhode Island v. Innis*, 446 U.S. 291, 302 (1980) (emphasis added). If Mr. Ruiz did not incriminate himself, the officers would have failed in their mission that day. Viewed objectively then, their "prolonged accusatory questioning" created a "coercive environment from which [Mr. Ruiz] would not feel free to leave." *Griffin*, 7 F.3d at 1518.

The last factor is a matter of plain record. The officers never told Mr. Ruiz he could end the encounter. When he entered the room, the officers said their names, gave their law enforcement affiliation, and then immediately asked him questions deliberately intended to elicit damning admissions. After 27 questions (or 7 pages

5

into the government's interrogation transcript), the officer told Mr. Ruiz she had "concerns" about him because of her discussions with his wife's "family members." She added, "It doesn't matter what you say about this case, I am not arresting you today. I'm not trying to make you nervous, but I want to let you know I'm here to have a conversation with you." Doc. 59-1 at 7. Being told he wasn't being arrested at that moment but was the focus of the agent's investigation, would have indicated to a reasonable person that he could be arrested right after he said "whatever [he] want[ed] about the case." *See Revels*, 510 F.3d at 1276 (although no officer told Revels she was under arrest, no officer "indicate[d] to the contrary."). This is especially so when she said nothing to counter that belief and stated that her questions would pointedly address "concerns" she had about him in relation to his wife's family members. Contrary to the government's suggestion, the officer's tone and "open ended questioning" would not have assuaged the individual's reasonable belief that he was suspected of criminal wrongdoing and that his cooperation was expected.[3] *See Stansbury v. California*, 511 U.S. 318, 325 (1994) (officer's belief regarding individual's guilt is relevant to show how a "reasonable person in the position of the individual being questioned would gauge the breadth of his or her freedom of action.").

---

[3] Even if the questions were "open ended" that does not cure the fact that their purpose was to elicit incriminating answers. The interpreter's presence also did not make the circumstances less coercive. Mr. Ruiz said he understood only "a little" of what was being asked of him. Att. That was evidenced by answers that did not correspond to the questions. It is unclear then what Mr. Ruiz actually comprehended during the 65 minutes he was interrogated.

Ultimately, the government does not explain how Mr. Ruiz would have known he could leave whenever he wanted. Its transcript proves the officers did not tell him he was free to leave before the interrogation began. It also shows that Mr. Ruiz was given permission to leave only after the officers had completed their questioning. Doc. 59-1 at 96-97. His question if he could "go" evinces that until then he believed he could not. *Id.* at 97. Where there is a "lack of a police advisement that the suspect is at liberty to decline to answer questions or free to leave," there is "a significant indication of a custodial detention." *Griffin*, 7 F.3d at 1518. Here, the officers did not communicate to Mr. Ruiz in any way that once he sat down, he could leave the station at any time.

The government's insistence that *United States v. Chee*, 514 F.3d 1106 (10th Cir. 2008) dictates the outcome in its favor overlooks crucial factual differences. There, unlike here, the accused was told at the beginning of the encounter that he was not under arrest, that he was free to leave and in fact did leave. *Id.* at 1111, 1114. He also was told then that "he did not have to talk." *Id.* at 1114. Although he decided to talk his interrogation was notably shorter than Mr. Ruiz's. The court stressed the importance of these facts because its custody analysis is affected by "whether the suspect is made aware that he or she is free to refrain from answering questions or to end the interview at will . . ." *Id.* at 1112-13. It then found that because the officers informed Chee up front about his options, the coercive impact of being questioned in a "nonpublic office at the police department" was diminished.

*Id.* at 1114.  Consequently, the court concluded "all the circumstances" would have led a reasonable person to believe he was not in custody.  *Id.*  Here, by contrast, the officers never expressly told Mr. Ruiz he was free to not answer questions, terminate the interview whenever he wanted and leave at will.  While they did eventually tell him he was not under arrest at the moment, it was well after the interrogation began and not accompanied by a statement that he was free to leave.  The totality of the circumstances differ significantly; given the dissimilarities, *Chee* actually helps Mr. Ruiz's argument.

The Tenth Circuit has said that although "these factors" Mr. Ruiz has discussed "are useful," it is whether "the police-citizen encounter as a whole" indicates custody, "rather than picking some facts and ignoring others."  *Jones*, 523 F.3d at1240.  The broad view here is stark.  Officers summoned Mr. Ruiz to the police station with the task of getting him to incriminate himself, and they were successful.  They employed several tactics to do so.  They appeared courteous, they obfuscated their intentions, they isolated him inside the station as they asked questions meant to incriminate him, and they disregarded any constitutional warnings as Mr. Ruiz ostensibly incriminated himself, for over an hour.  This is precisely a situation in which an individual should know that he has a right to not incriminate himself.  The strictures of *Miranda* and its progeny cannot be overcome by officers who use guile and craft instead of brute force to extract a confession.  This would trump tactics over the Constitutional guarantees that must be

protected. As the Supreme Court recognized in *Miranda*,

> [w]ithout the protections flowing from adequate warning and the rights of counsel, all the careful safeguards erected around the giving of testimony, whether by an accused or any other witness, would become empty formalities in a procedure where the most compelling possible evidence of guilt, a confession, would have already been obtained at the unsupervised pleasure of the police.

384 U.S. at 466.

Did the officers' words and behavior then deprive Mr. Ruiz of "freedom of action in any significant way?" *Griffin*, 7 F.3d at 1516. The objective evidence shows that they did. That freedom was curtailed for effectively the entire interview. A reasonable person in Mr. Ruiz's situation would not have felt free to discontinue the questioning, let alone get up and leave the station. Thus, the officers were obligated to recite *Miranda* warnings before interrogating Mr. Ruiz. Because they failed to do so, the Court should suppress all of Mr. Ruiz's statements. *See Griffin*, 7 F.3d at 1519 (reversing district court's denial of suppression motion and ordering court to grant motion because Griffin was in custody and *Miranda* warnings were required before

officer's "extensive questioning.").

                                  Respectfully submitted,

                                  FEDERAL PUBLIC DEFENDER
                                  111 Lomas NW, Suite 501
                                  Albuquerque, NM 87102
                                  (505) 346-2489
                                  amanda_lavin@fd.org

                                  *s/Amanda Lavin*
                                  Amanda Lavin
                                  Assistant Federal Public Defender

                                  *s/Emily Carey*
                                  Emily Carey
                                  Assistant Federal Public Defender

ATTACHMENT
TRANSCRIPTION/TRANSLATION OF PORTION OF INTERVIEW WITH JOEL RUIZ
FBI 302 - 10-27-21

Transcription/translation of portion of interview with Joel Ruiz
FBI 302 10-27-2021

Transcribed and translated by Ruth A. Warner, staff interpreter for the Federal Public Defender's Office in Albuquerque, District of New Mexico.

LEGEND

The left column is a transcription of the audio. Portions in English are noted in italics. The right column shows the English translation of the Spanish portions.

|        |                          |
|--------|--------------------------|
| BERRY  | Special Agent Allison Berry |
| RUIZ   | Joel Ruiz                |
| INT    | Interpreter              |
| [ ]    | Translator's notes       |

|       | TRANSCRIPTION | TRANSLATION |
|-------|---------------|-------------|
|       | [Note, the interpreter initially explains her role to Ruiz, just to interpret into Spanish. She interprets a few introductory lines into Spanish (Bates 516 lines 10-21, and Bates 517, 18-22) the interview then continues in English until Bates 222 line 5] | |
|       | [Time stamp 0:04:35] | |
| INT   | *I'm sorry, can I just jump in just to make sure that he understands everything?* | |
| BERRY | *Absolutely, please.* | |
| INT   | *Okay.* ¿Sí le entendió bien todo o quiere que le haga alguna…? | *Okay.* You did understand everything well or do you want me to do any…? |
| RUIZ  | Sí, sí le entiendo poquito. | Yes, I do understand a little. |
| INT   | *Okay. No, he understands you.* | |
|       | [Interview continues primarily in English] | |

Page **1** of **2**

### TRANSLATOR CERTIFICATION

I am a Spanish<>English court interpreter certified by the Administrative Office of the U.S. Courts and certified to translate from Spanish to English by the American Translators Association (ATA). I hereby certify that the preceding page represents a complete and accurate transcription and translation of this portion of the audio recording, rendered to the best of my knowledge and belief.

*[signature]*

Ruth A. Warner                     Date: 6 June 2023

*[ATA Certified Translator seal: Ruth A. Warner, Spanish into English, Certification #434886. Verify at www.atanet.org/verify]*

Certificate of Service

I hereby certify that on June 7, 2023, this pleading was filed electronically through the Court's CM/ECF system, by which counsel for the government was served electronically, as more fully reflected in the Notice of Electronic Filing.

                                                *s/Amanda Lavin*
                                                Amanda Lavin
                                                Assistant Federal Public Defender